IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CAMDEN VICINAGE

_____ :

Anthony Martino,                                           :

                                    Plaintiff,          :          21-cv-20056 (RBK-MJS)

                    v.                                            :

                                                                    :          **OPINION/ORDER**

David Mazie, Esq., Adam Slater, Esq.               :

 and Mazie Slater Katz & Freeman LLC,          :

                                    Defendants.    :

_____ :

**KUGLER, United States District Judge:**

Before the Court in this Action are defendants' ["Mazie"] motion to dismiss ["MTD"] (Doc. No. 7) the complaint (Doc. No. 1-1) under *Fed.R.Civ.P.* ["*FRCP*"] *12(b) (6)* and plaintiff's ["Martino"] cross-motion for partial summary judgment (Doc. No. 15) under *FRCP 56*.

The complaint alleges Mazie's violation of New Jersey State Court Rules, in particular, 1:21-7(i) ["the Rule"], because of Mazie's receipt of continency fees gotten from the Olmesartan Multidistrict Litigation ["MDL"] settlement program, which Martino alleges were greater than allowed by the Rule. The MTD seeks dismissal with prejudice of all three claims of the complaint, each of which depends on violation of the Rule: 1) the over-compensation of a contingency fee; 2) because of the over-compensation, the alleged conversion by Mazie of Olmesartan MDL settlement amounts that should have gone to New Jersey litigants; and 3) consequently, an alleged unjust enrichment to Mazie. If there is no violation of the contingency fee Rule, then Mazie alleges that the complaint cannot state a claim for which relief can be granted.

**The COURT HAVING REVIEWED** the parties' submissions without a hearing in accordance with Rule 78.1 (b) and for the reasons stated below, and for good cause shown:

The Court **GRANTS** defendants' motions to dismiss **with prejudice** all claims in the Complaint; and

The Court **ORDERS** plaintiffs' cross-motion has been made moot by this opinion and directs the Clerk to close the Action.

## 1.0     Facts and Procedural Background

In April 2015, the Judicial Panel on Multi-District Litigation ["JPML"] consolidated multiple cases filed in various state and federal courts into the Olmesartan Multi-District Litigation ["MDL"]. These cases concerned whether ingestion of the hypertensive Olmesartan caused gastro-intestinal injury that mimicked celiac disease.  Daichii Sankyo Ltd., a Japanese corporation, manufactured Olmesartan, which is the generic of the patented drug Benicar®, and used certain U.S. distributors to market and sell it in the United States.   There were approximately 1700 plaintiffs in the MDL at the time of settlement.

As the transferee Court for the Olmesartan MDL, the Court takes judicial notice of some facts and procedural background from its own knowledge and experience.  After two years of extensive discovery, which included much document production, expert reports, bellwether selection, etc., in April 2017 the parties negotiated in the MDL a settlement having a first settlement aggregate amount of $350,000,000.00.   The Brown Greer ["BG"] law firm was the MDL's administrator of the Olmesartan settlement program; BG orchestrated the announcement of the settlement and managed the thousands of subsequent claimants who signed onto the program.

During the three week settlement sign-up period, over 10,800 claimants applied to the program. When the dust settled and all viable claims were accounted for in the Olmesartan settlement program, the total number of actual registrants, that is, those eligible to receive a payout for their injuries, eventually reduced to about 8500.  As this number of registrants was about 3 times larger than expected, the original settlement amount was increased.

The MDL administrator, BG, was responsible for calculating the amount of damages owed to the thousands of MDL registrants.  BG, along with the parties, established six general categories of injury, each of which represented a minimum payout amount.  BG and the parties also developed an accompanying points systems by which to account for aggravating health events, like hospitalization, or extreme weight loss, and which thereby allowed an increase in the calculated payout amount upon documentation of these experiences.

In registering for the Olmesartan settlement program, registrants, whether advised by their law firms (or, if *pro se*, by a designated Pro Bono law firm), agreed to abide by certain requirements, the most important of which was the relinquishment of the right to initiate a lawsuit in court for the same injuries.   In order to receive a payout, registrants also had to

provide within a required period sufficient evidence that demonstrated the alleged injury, else they were dropped from the settlement without opportunity to rejoin.   Importantly, meeting this data requirement within the designated period sometimes meant a registrant's attorney had to corral its clients and their medical providers to get proper proof of Olmesartan ingestion and related injury.  The Olmesartan settlement program gave registrants the right to appeal their initial payout determination, and typically it was registrants' attorneys who initiated and executed these appeals.   After BG's initial  award determination, there were two levels of appeals. The first was to seek a review by BG of its own award determination in light of all the evidence and argument provided by plaintiffs.  The second was to have an appointed Magistrate Judge review BG's award determination against the registrant's accompanying submissions.

At first, Daiichi required the Olmesartan settlement program to register at least 95 percent of all possible litigants and claimants; later, it increased the required percentage to 99 percent.  In so doing, Daiichi was seeking assurance of a virtual end to Olmesartan litigation. As it turned out, this requirement fostered Daiichi's success in getting the MDL terminated as no individual litigants remained after the administration of the Olmesartan settlement program and the damage award payouts.

Plaintiffs' counsel had their own aims in the settlement.  These depended on the extent of their legal efforts to receive compensation, which was based on a contingency fee agreement between the attorney and the registrant.  This meant the attorney received a contracted-for percentage of the individual client's damage award.  It may be that some plaintiffs' counsel exerted minimal effort to get their clients registered in the Olmesartan settlement program by using paralegals or junior associates to help clients fill out the registration forms, obtain the needed medical records, and answer clients' queries as to how long payout would take.  And, for most plaintiffs' counsel, the contingency fee agreement the client signed typically gave counsel a minimum of one third of the client's damage award.

However, there were some plaintiffs' counsel who were responsible for developing the litigation record: managing the litigation, arguing discovery motions, obtaining and paying for experts, conducting discovery, creating a record, taking depositions, etc.  Throughout the litigation and the settlement period, Adam Slater, Esq., served as plaintiffs' lead counsel and headed the plaintiffs' executive committee, supported by his law firm of Mazie Slater Katz and

Freeman, defendant herein.  Not only were Mr. Slater's tasks many and varied, but he steered the plaintiffs' litigation efforts to ensure the incentivization of Daiichi to settle.

Since products liability cases consolidated in a federal district court, as in the Olmesartan MDL, are actionable only under state law, plaintiffs residing in New Jersey were not eligible to be consolidated into the Olmesartan MDL.  That is, a  New Jersey litigant could enter their state law action into the District of New Jersey MDL action, but only in a New Jersey state court.  To be clear, plaintiff Martino and the putative class he allegedly represents, as residents of New Jersey, were not litigants in the Olmesartan  MDL but rather were litigants in an Olmesartan Multicounty Litigation ["MCL"] in New Jersey , docket number ATL-L-00 -15.  Like the national Olmesartan MDL, the Olmesartan MCL was a consolidated action.  But, the MCL comprised only cases of New Jersey residents who had ingested Olmesartan and had experienced injury, whereas the MDL comprised cases filed by residents of all other states.  Moreover, like all other Olmesartan claimants, the MCL litigants were eligible to register into the Olmesartan settlement program upon its commencement on 1 August 2017.


### 3.0    LEGAL STANDARD

Rule *12(b)(6)* governs a court's review of a motion to dismiss for failure to state a claim upon which relief can be granted. In evaluating such a motion, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009) (*quoting Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008)).  That is, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The general inquiry as to the plausibility of a claim on its face is "whether [movants] should be afforded an opportunity to offer evidence in support of their claims" not whether the movant will succeed on the merits. *In re Rockefeller Ctr. Prop., Inc.,* 311 F.3d 198, 215 (3d Cir.2002). The specific inquiry involves a three-part analysis (*Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir.2010)) in which a court:  1) states "the elements a plaintiff must plead to state a claim." *Id.*  (*quoting Iqbal,* 556 U.S. at 675);  2) identifies those allegations which,

"because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (*quoting Iqbal,* 556 U.S. at 680); and 3) assuming the veracity of well-pleaded factual allegations, "determine[s] whether they plausibly give rise to an entitlement for relief." *Ibid.*

Practically speaking, this plausibility analysis is a "context-specific task requiring the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. A claim fails when a court can infer only that it is merely possible rather than plausible. *Id.* Plausibility cannot lie upon legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements". *Id.* at 678.

In deciding a motion to dismiss, a court reviews the allegations in the complaint and exhibits attached to it and may look beyond the complaint to matters of public record without converting the motion to a summary judgement motion. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993); *see also Sands v. McCormick,* 502 F.3d 263, 268 (3d Cir. 2007). However, the Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

The Federal Rules of Evidence provide that courts may take judicial notice of those adjudicative facts that are outside the trial record and "not subject to reasonable dispute." *Fed.R.Evid. 201(b).* A judicially noticed fact must either be generally known within the jurisdiction of the trial court, or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *See id., especially at Fed.R.Evid 201(c); Werner v. Werner,* 267 F.3d 288, 295 (3rd Cir.2001); *see also In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 398 (3rd Cir.2000); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2nd Cir.1991).

### 4.0    DISCUSSION

The parties note the resolution of this MTD depends on the proper interpretation of certain language in New Jersey Court Rule 1:21-7(i). As the parties dispute which paragraph of Rule 1:21-7 applies, the entire Rule is provided in the footnote.[1] The issue is whether **each**

---

[1] **Rule 1:21-7. Contingent Fees**

**(a)** As used in this rule the term "contingent fee arrangement" means an agreement for legal services of an attorney or attorneys, including any associated or forwarding counsel, under which compensation, contingent in whole or in part upon the

successful accomplishment or disposition of the subject matter of the agreement, is to be in an amount which either is fixed or is to be determined under a formula.

**(b)** An attorney shall not enter into a contingent fee arrangement without first having advised the client of the right and afforded the client an opportunity to retain the attorney under an arrangement for compensation on the basis of the reasonable value of the services.

**(c)** In any matter where a client's claim for damages is based upon the alleged tortious conduct of another, including products liability claims and claims among family members that are subject to Part V of these Rules but excluding statutorily based discrimination and employment claims, and the client is not a subrogee, an attorney shall not contract for, charge, or collect a contingent fee in excess of the following limits:

(1) 33 1/3 % on the first $750,000 recovered;

(2) 30% on the next $750,000 recovered;

(3) 25% on the next $750,000 recovered;

(4) 20% on the next $750,000 recovered; and

(5) on all amounts recovered in excess of the above by application for reasonable fee in accordance with the provisions of paragraph (f) hereof; and

(6) where the amount recovered is for the benefit of a client who was a minor or mentally incapacitated when the contingent fee arrangement was made, the foregoing limits shall apply, except that the fee on any amount recovered by settlement before empaneling of the jury or, in a bench trial, the earlier to occur of plaintiff's opening statement or the commencement of testimony of the first witness, shall not exceed 25%.

**(d)** The permissible fee provided for in paragraph (c) shall be computed on the net sum recovered after deducting disbursements in connection with the institution and prosecution of the claim, whether advanced by the attorney or by the client, including investigation expenses, expenses for expert or other testimony or evidence, the cost of briefs and transcripts on appeal, and any interest included in a judgment pursuant to R. 4:42-11(b); but no deduction need be made for post-judgment interest or for liens, assignments or claims in favor of hospitals or for medical care and treatment by doctors and nurses, or similar items. The permissible fee shall include legal services rendered on any appeal or review proceeding or on any retrial, but this shall not be deemed to require an attorney to take an appeal. When joint representation is undertaken in both the direct and derivative action, or when a claim for wrongful death is joined with a claim on behalf of a decedent, the contingent fee shall be calculated on the aggregate sum of the recovery.

**(e)** Paragraph (c) of this rule is intended to fix maximum permissible fees and does not preclude an attorney from entering into a contingent fee arrangement providing for, or from charging or collecting a contingent fee below such limits. In all cases contingent fees charged or collected must conform to RPC 1.5(a).

**(f)** If at the conclusion of a matter an attorney considers the fee permitted by paragraph (c) to be inadequate, an application on written notice to the client may be made to the Assignment Judge or the designee of the Assignment Judge for the hearing and determining of a reasonable fee in light of all the circumstances. This rule shall not preclude the exercise of a client's existing right to a court review of the reasonableness of an attorney's fee.

**(g)** Where the amount of the contingent fee is limited by the provisions of paragraph (c) of this rule, the contingent fee arrangement shall be in writing, signed both by the attorney and the client, and a signed duplicate shall be given to the client. Upon conclusion of the matter resulting in a recovery, the attorney shall prepare and furnish the client with a signed closing statement.

**(h) Calculation of Fee in Structured Settlements.** As used herein the term "structured settlement" refers to the payment of any settlement between the parties or judgment entered pursuant to a proceeding approved by the Court, the terms of which provide for the payment of the funds to be received by the plaintiff on an installment basis. For purposes of paragraph (c), the basis for calculation of a contingent fee shall be the value of the structured settlement as herein defined. Value shall consist of any cash payment made upon consummation of the settlement plus the actual cost to the party making the settlement of the

**claim of injury** of each New Jersey plaintiff in the Olmesartan MCL, arising from ingestion of Olmesartan, is sufficiently similar to fall within the language of Rule 1:21-7. That is, the issue is whether the claims of each New Jersey plaintiff in the MCL arose "out of the same transaction or set of facts or involve substantially identical liability issues". Since clearly different New Jersey plaintiffs bought and ingested Olmesartan in different transactions and at different times, the dispute practically devolves to whether all claims in the MCL "involve substantially identical liability issues".

Plaintiff Martino argues that all liability claims of the former MCL plaintiffs do indeed fall within that substantially identical description and that the Rule therefore applies. If, as Martino argues, all MCL claims do have "substantially identical liability issues", then the contingency fees Mazie received and which arise from the Olmesartan settlement awards of the former MCL plaintiffs must be limited to those stated in Rule 1:21-7(i). Martino, and the putative plaintiff class he seeks to represent, therefore demand a recalculation of the Olmesartan settlement contingency fees according to the Rule and a refund of the excess fees paid to Mazie.

Mazie argues that all claims of the former MCL plaintiffs do not arise from either the same transaction or the same facts nor involve a substantially identical liability. Further, Mazie argues, Rule 1:21-7(i) cannot apply to Mazie's contingency fees obtained in the Olmesartan settlement program because of the disparity in specific liability issues from registrant to registrant. Mazie deduces that, if Rule 1:21-7(i) does not apply to its Olmesartan settlement contingency fees, then Martino's complaint cannot state a claim upon which relief may be granted since all three counts in the Martino complaint require violation of Rule 1:21-7(i).

To zero in on the issue, the Court confirms that resolution of the MTD requires interpretation of whether the claims brought by MCL plaintiffs to the Olmesartan settlement

---

deferred payment aspects thereof. In the event that the party paying the settlement does not purchase the deferred payment component, the actual cost thereof shall be the actual cost assigned by that party to that component. For further purposes of this rule, the party making the settlement offer shall, at the time the offer is made, disclose to the party receiving the settlement offer its actual cost and, if it does not purchase the deferred payment aspect of the settlement, the factors and assumptions used by it in assigning actual cost.

**(i) Calculation of Fee in Settlement of Class or Multiple Party Actions.** When representation is undertaken on behalf of several persons whose respective claims, whether or not joined in one action, arise out of the same transaction or set of facts or involve substantially identical liability issues, the contingent fee shall be calculated on the basis of the aggregate sum of all recoveries, whether by judgment, settlement or both, and shall be charged to the clients in proportion to the recovery of each. Counsel may, however, make application for modification of the fee pursuant to paragraph (f) of this rule in appropriate cases.

program involved "substantially identical liability issues" to all other claims in the MCL and/or in the Olmesartan settlement program.   It is critical to appreciate that the only way an Olmesartan registrant—regardless of whether an MCL litigant or an MDL litigant or a non-litigant—could receive a damage award from the Olmesartan settlement program was to timely register into the settlement program, and execute a contingency fee agreement with an attorney[2] who oversaw and directed the registration process.  The Court therefore takes the view that THE SUM TOTAL OF all claims of all registrants in the Olmesartan settlement program EITHER involved substantially identical liability issues OR they did not.   Put differently, there can be no rational, medical, logical, or legal justification why the claims of a subset of Olmesartan registrants could be interpreted as having substantially identical liability based merely on the fact they arose in the MCL.  Either all MCL claims involve substantially identical liability issues in the same way that all MDL claims do, or NO claims of any Olmesartan registrant have "substantially identical" liability as any other such claim.

It is also critical not to lose sight that Martino as well as the putative class plaintiffs who were litigants in the Olmesartan MCL had to have registered into the Olmesartan settlement program in order to receive their award.  This means that all MCL litigants who were represented by Mazie, signed a Mazie contingency fee award, registered in the Olmesartan settlement program, AND received a damages award **UNDER THE SETTLEMENT PROGRAM, NOT UNDER THE MCL.**   To bring the point home, Martino, and all other putative plaintiffs here, received an Olmesartan settlement award only because of the common benefit efforts of Adam Slater and his firm Mazie, which worked to bring Daiichi to the settlement table and drove the Olmesartan settlement program to completion.

Since all Olmesartan MDL litigants AND all Olmesartan MCL litigants AND all other claimants had to register into the Olmesartan settlement program to receive a damages award,  the Court must construe whether the Rules of Consolidation for the MDL or the MCL automatically deemed all consolidated plaintiffs to have experienced substantially identical liability.   In construing the meaning of a statute, a Court looks to the words within that statute and to construction guidance in other statutes.  New Jersey Statute § 1:1-1 states that words and phrases are construed together with their context and given their generally accepted meaning.[3]

---

[2] There were only a handful of *pro se* registrants in the Olmesartan settlement program.

[3] **N.J.S. § 1:1-1  General rules of construction**

In addition to examining the intrinsic language and context of the statute, the Court researched extrinsic guidance by conducting several, different search queries for cases, court orders, and MDL actions to see how other states have interpreted "arise out of the same transaction or set of facts or involve substantially identical liability issues". The Court came up short and found no court cases or jurisprudence that equates a plaintiff's single, product liability claim in an MDL or MCL to other such claims in the same MDL or MCL. The very absence of relevant case law as to whether New Jersey (or any other state) Court Rules govern the contingency fee award of MDL or MCL plaintiffs militates against the applicability of Rule 1:21-7(i) here.

To examine whether the language of Rule 1:21-7(i) itself applies to a Multidistrict or MultiCounty Litigation, the Court turns to the consolidation Rules for an MDL and for a New Jersey MCL.

**Multidistrict Litigation Consolidation Statute**

28 U.S.C § 1407 authorizes the creation of a multidistrict litigation:

*(a) When civil actions involving **one or more common questions of fact** are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.* [emphasis added].

In consolidating a Multidistrict Litigation, the Judicial Panel on Multidistrict Litigation ["JPML"] focuses on judicial economy and the prevention of unnecessary congestion in court rooms across the country of cases having common facts. An MDL plaintiff's claim need not be identical in fact nor substantially identical in liability as all other plaintiffs' claims to gain entry into an MDL.

For example, to have the JPML transfer a case into the Olmesartan MDL, two common facts were required: the plaintiff 1) ingested Olmesartan for high blood pressure within a certain time period, and 2) experienced one or more of a variety of symptoms that resembled celiac disease, such as persistent vomiting or weight loss or hospitalization or stomach upset

---

In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language. Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning.

or diarrhea or cramping or other digestive disorder, etc.   No plaintiff had to experience all of these symptoms or even any particular one of these.  Moreover, any combination of these symptoms qualified as an entry fact.  Since a plaintiff's particular experience of injury depended on the nature, extent, number, and severity of the symptoms, the Daiichi defendants' liability to that plaintiff was unique.

The common fact standard is not at all the same standard for certifying a class of plaintiffs, which because of the substantial similarity of  facts, liability, etc. across the class can be embodied and exemplified by a class representative's allegations of fact and liability.   The common fact standard is a more relaxed, much less stringent definition of the commonality of claims across a group of plaintiffs.


**Multicounty Litigation Rule and Guidelines**

Consolidation of cases across New Jersey counties is authorized by New Jersey Court Rule 4:38A:

> *The Supreme Court may designate a case or category of cases as Multicounty Litigation to receive centralized management in accordance with criteria and procedures promulgated by the Administrative Director of the Courts upon approval by the Court. Promulgation of the criteria and procedures will include posting in the Multicounty Litigation Information Center on the Judiciary's Internet website (http://www.njcourts.com).*

The approved procedures of the Administrative Director of the Courts include:

> ***MULTICOUNTY LITIGATION GUIDELINES AND CRITERIA  FOR DESIGNATION [As Promulgated by Directive# 08-12 Pursuant to Rule 4:38A][4]***

…

> ***Criteria to be Applied in Determining Whether Designation as Multicounty Litigation is Warranted***
>
> *In determining whether designation as multicounty litigation is warranted, the following factors, among others, will be considered:*

---

[4] Glenn A. Grant, Memorandum from the Acting Administrative Director of  New Jersey Courts to Civil Presiding Judges, Communicating Directive #08-12, August 7, 2012 on MultiCounty Litigation Guidelines.

Case 1:21-cv-20056-RBK-MJS   Document 26   Filed 05/06/22   Page 11 of 14 PageID: 986

11

> *whether the case(s) possess(es) the following characteristics:*
>
> - *it involves large numbers of parties;*
>
> - *it involves many claims **with common, recurrent issues of law and fact** that are associated with a single product, mass disaster, or complex environmental or toxic tort;*
>
> - *there is geographical dispersement of parties;*
>
> - *there is a **high degree of commonality of injury or damages** among plaintiffs;*
>
> - *there is a value interdependence between different claims, that is, the perceived strength or weakness of the causation and liability aspects of the case(s) are often dependent upon the success or failure of similar lawsuits in other jurisdictions; and*
>
> - *there is a degree of remoteness between the court and actual decision- makers in the litigation, that is, even the simplest of decisions may be required to pass through layers of local, regional, national, general and house counsel.   [emphasis added]*

In comparing the language authorizing consolidation of MDL cases with that authorizing New Jersey MCL cases, the Court notes the recurring word in both Rules of "COMMON" or "COMMONALITY", not "IDENTITY".   Notably, in the New Jersey Consolidation Guidelines, there is no requirement that multicounty cases have the "same facts" or "substantially identical liability issues".   The Court finds the Federal consolidation statute and the New Jersey consolidation guidelines confirm that actions need have only common, not identical, liability issues to be consolidated.

The similarity in the Federal consolidation statute and the New Jersey consolidation rule means,  regardless how a claimant represented by Mazie in a contingency fee agreement entered the Olmesartan settlement program, all MDL and MCL Olmesartan cases were consolidated because they had "common" issues of fact and liability, not "substantially identical" liability, to other such cases.

In addition to the Court's not finding relevant caselaw, neither party cited such as to the definitive application of Rule 1:21-7(i) to MDL or MCL contingency fee cases.  Although plaintiff cited *Estate of Faheem Williams v. Division of Youth and Family Services*, No. ESX-L-83-05, 2006 WL 4469674 (L. Div. Mar. 30, 2006), *rev'd on other grounds*, In re Est. of F.W., 398 N.J. Super. 344, (App. Div. 2008), this case has nothing to do with nor logically applies to product liability

cases in an MDL. It concerned the extreme physical abuse of brothers placed in a New Jersey foster home; in that case, there was no question as to the substantially identical liability of the foster family abusers or the identical facts of abuse.  The identicality of those facts and liability do not characterize the facts and liability of Olmesartan settlement registrants.  The Court finds the cited case not on point.   Plaintiff also referred to the following law review article, Lester Brickman, *The Asbestos Litigation Crisis: Is There A Need for an Administrative Alternative?, 13* CARDOZO L. REV. *1819,* (1992) and to a later, very similar article by the same author, which expounded that contingency fees awarded to attorneys in an MDL always have a slight but persistent odor of defrauding and conversion.  The Brickman article is a red herring as it discusses a clear case of illegal behavior on the part of MDL attorneys, which is inapplicable here.

Ultimately, the Court holds the plain language of Rule 1:21-7(i) does not apply to cases consolidated either in a Multicounty litigation or a Multidistrict litigation.  And this inapplicability has nothing to do with the specific, underlying legal issues, whether business torts or products liability.   This holding arises from the Court's experience as the transferee Court of the Olmesartan MDL to observe firsthand that the administration of the Olmesartan settlement program concerned not only the common liability issue of injury caused by Olmesartan ingestion but also the very different and the very specific factual details of each such injury for each consolidated case.

Since each case registered in the Olmesartan settlement program had a common liability as well as specific facts that supported a unique damage award, such cases, including Martino's and those of the putative class of plaintiffs here, cannot ground allegations that give rise to the applicability of Rule 1:21-7(i).

Although not finding New Jersey (or other state) case law that applies Rule 1:21-7(i) to MDL or MCL litigations, the Court has also deliberated over the equitable nature of defendants' award as raised by Martino's unjust enrichment claim.   The Court has come across class action cases in New Jersey where Rule 1:21-7(i) has been suspended, especially in business tort contexts; these include the seminal case *Incollingo v. Canuso*, A.2d 778 (App. Div. 1997), and the sequential case *Lubitz v. DaimlerChrysler Corp.,*  2006 WL 3780789 (Sup. Ct. Bergen County, 21 Dec 2006).   While not concerning product liability issues as in the Olmesartan settlement program, these cases give a glimmer of understanding as to when the

Rule may be excepted.

Mindful that *Incollingo* stated expressly no exception to the Rule exists for products liability cases, the Court nonetheless finds illustrative Judge Harris's reasoning in *Lubitz*. There Judge Harris recalculated the attorneys' fees in a breach of warranty class action by applying both *Incollingo* to keep the contingency fee outside of the Rule WHILE using Third Circuit *Gunter*[5] methodology.   To the point, such methodology comprises "the most mature and well-developed analyses of attorneys' fees" of any other Circuit Court.   *Lubitz*, 2006 WL 370789, at *20.

Judge Harris's balancing of the *Gunter* factors[6] and the *Incollingo* exception to the contingency fee calculation exemplifies in a practical way why the Rule does not apply here. Upon calculating that the attorney fee award under the *Incollingo* exception (coupled with a lodestar calculation under *Rendine v. Pantzer,* 141 N.J. 292 (1995)) would have amounted to 20% of the total settlement award, Judge Harris applied the *Gunter* factors to reduce that percentage to 15% of the total settlement amount, which he found more reasonable and equitable.

The total amount of the Olmesartan settlement was approximately $380,000,000. Besides the negotiated contingency fee agreements— which the Court was not privy to,  but estimates were generally at least 33-1/3 % of each plaintiff's settlement award— plaintiffs' attorneys were compensated from a common benefit fund.  This fund awarded plaintiffs' attorneys 9.5% in fees of the total settlement award, which was apportioned among those law firms that had evidenced common benefit work for the litigation and settlement.   To the point, the 9.5% of the total settlement award was distributed according to the efforts of dozens of specific law firms; it was awarded based on evidence and the Court's deliberation. *See* Docket Matter No. 1:15-md-2606 (RBK-JS), Docket No. 1263, dated 14 Nov 2019.  In essence, the  common benefit fund award was remuneration to the Olmesartan registrants' attorneys for their efforts to steer the MDL litigation and to bring the MDL to settlement.   The MCL litigants unwittingly benefited from these common benefit efforts, which propelled the Olmesartan settlement program.

---

[5] *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir.2000).
[6] *A. Size of Fund and Number of Persons Benefited; B. Presence or Absence of Substantial Objections; C. Skill and Efficiency of Attorneys Involved; D. Complexity and Duration of the Litigation; E. Risk of Nonpayment; F. Amount of Time Devoted by Counsel; G. Awards in Similar Cases*

Since the Court has found the language of the Rule inapplicable to the MCL and the MDL plaintiffs and since the common benefit fund award is well within the reasonable and equitable percentages of Third Circuit examples (*see Lubitz*, 2006 WL 370789, at *22), Mazie's motion to dismiss is **GRANTED WITH PREJUDICE.**

This decision also resolves plaintiff's outstanding partial motion for summary judgment since the claims do not state a cause of action for which relief can be granted.  Accordingly, the Court directs the Clerk to **CLOSE THIS MATTER**.

Dated:  6 May 2022                                                    s/ Robert B. Kugler
                                                                             ROBERT B. KUGLER
                                                                             United States District Judge